Coulter Estate.

210

Argued September 30, 1954. Before STERN, C. J.,
STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Elder W. Marshall* and *C. Ward Eicher,* with them
*Louis E. Sensenich* and *Reed, Smith, Shaw & McClay,*
for appellants.

*Robert W. Smith*, with him *Smith, Best & Horn*, for appellee.

Opinion by Mr. Justice Musmanno, November 8, 1954:

By the second codicil to her will, Mrs. Emma W. Coulter, who died on November 2, 1929, created a trust of all her real estate and $200,000 in personal property for the term of 21 years or until an earlier termination by the trustees or the death of both trustees named in the will. The income from the trust was to be divided not more frequently than annually among Mrs. Coulter's five children who also were to share the principal of the trust upon its termination. The trustees were Richard Coulter, now living, and Rebecca Coulter Barclay, who died on June 21, 1937. The trust ended on November 2, 1950, at the end of its 21-year term.

In setting up the trust, Mrs. Coulter in Article Two of the Second Codicil, devised all her real estate to her children Richard Coulter and Rebecca Coulter Barclay, as trustees, vesting them with vast powers which included: (1) the right to manage, handle, control and operate the same; (2) to repair; (3) to lease; (4) to sell at public or private sale for such price as the trustees should deem proper; (5) to lay out and sub-divide into lots; (6) to lay out, construct, grade, pave and curb streets and alleys, and to dedicate such streets and alleys to public use; (7) to construct and operate pipe lines for water and gas, and conduits and pole lines for wires for the transmission of telephone messages and power purposes; (8) to landscape and beautify the lands of which she died seized. The testatrix further declared in her will that: "The enumeration of certain specific powers herein contained shall

not be held to limit the broad powers that I hereby vest in said trustees, it being my will that they shall handle, control, operate and manage all my real estate, improved or unimproved, during the existence of said trust, with the same powers as if they were the absolute owners thereof in fee simple."

In order to assure the effectuation of her intentions with regard to the real estate, Mrs. Coulter bequeathed to the trustees the $200,000 heretofore mentioned to be used by them at their discretion in exercising the powers she conferred upon them.

Mrs. Coulter's estate at the time of her death consisted of $2,175,921, in personalty and real estate, valued for Federal estate tax purposes at $406,838. The real estate included several improved properties and vacant lots in the City of Greensburg, a one-half interest in 1115 vacant lots in the Borough of Southwest Greensburg, the Hawksworth Farm of 118 acres, another 43 acres of vacant land, and 22 unimproved lots, all in Hempfield Township, which adjoins the City of Greensburg.

When Rebecca Coulter Barclay died on June 22, 1937, leaving Richard Coulter as surviving trustee, her interest as beneficiary passed to her son, John Barclay, Jr., one of the present appellants. Another son, Henry W. Coulter, had died on August 18, 1932, bequeathing his residuary estate, (which would include his interest in his mother's trust), to his four children.

Since Rebecca Coulter Barclay and Richard Coulter had also been named executors of their mother's will, they filed their first and partial account *as executors* on May 18, 1930, claiming and taking credit for $60,000 for their "time, trouble and expense." They also, without claiming any further executor fees, filed as executors a second and final account on September

13, 1932. These accounts were confirmed absolutely and no exceptions were filed thereto.

On February 18, 1949, Richard Coulter, as surviving trustee, filed a first and partial trustee's account. In this account he accounted for $219,039.86 of principal-personalty, exclusive of moneys he had transferred from principal-realty; $461,134.65 of principal-realty; and $149,822.56 of income-personalty. This account also showed distributions to devisees and legatees of $375,000. The balance shown for further accounting, after deducting the above distributions, was $281,539.28. He took no credit for any fee as trustee in this account, to which no exceptions were filed, and it was confirmed absolutely.

The life of the trust having expired on November 2, 1950, Richard Coulter filed his second and final account as surviving trustee on November 14, 1951. He accounted therein (exclusive of transfers from principal-realty to principal-personalty and income-personalty) for $25,524.25 of principal-personalty, $341,391.45 of principal-realty and $23,059.01 of income-personalty a total of $389,974.71 of which $281,537.93 had been distributed back to him on his first accounting as trustee. The difference of $108,436.78 was made up in large part of:

| | |
|---|---|
| Realization from personalty over decreed value | $ 3,072.07 |
| Profit from sales of real estate over 'book value' | 64,489.34 |
| Transferred from rentals of Coulter Building | 18,847.49 |
| Adjustments to value of real estate | 20,677.97 |
| | $107,986.87 |

The only income from personalty was $300 received as interest on bonds.

The account showed that $315,406.70 had been distributed to beneficiaries under the will and that the balance remaining for distribution was $10,293.63.

*...In this final trustee's account, Richard Coulter claimed a trustee's fee of $15,000.*

The beneficiaries, William A. Coulter, John Barclay, Jr., and Margaret Coulter all filed exceptions to the trustee's final account. William A. Coulter filed exceptions to the $15,000 accountant's fee as trustee, stating that: (1) Richard Coulter, the accountant, was an executor of his mother's will and as such executor he shared in the $60,000 executors' fee; (2) the accountant did not claim any fees in annual statements to beneficiaries nor in his First and Partial Account; and (3) the accountant-trustee was negligent in the administration of the trust estate.

William A. Coulter also excepted to (1) credits taken in the First and Partial Account for losses in operation of the Coulter Building; (2) to credits taken in the First and Partial Account for losses in operation of the Hawksworth Farm; (3) to credits claimed in the second and Final Account for losses in operation of the Hawksworth Farm; and (4) to losses alleged to have been sustained by sales of real estate at grossly inadequate prices to John H. Coulter, et ux., and to Paul S. Bair, et al.

The exceptions were heard and testimony was taken before Copeland, President Judge of the Orphans' Court of Westmoreland County, on April 28, 1953. On July 16, 1953, Judge Copeland filed findings and conclusions, accompanied by his discussion of the case, *and dismissed all exceptions.* On November 25, 1953,

the account was confirmed absolutely and a decree of distribution was entered. Exceptions to the final decree were dismissed and the exceptants appealed to this court.

It is the contention of the exceptants that the trustee waived his commissions when he failed to claim, deduct or withhold them in (1) the annual statements he rendered and the distributions he made among the beneficiaries during the 16½ years period; and (2) in the first and partial account filed at the end of that period; and (3) when he failed to provide a reserve for their future payment. While it is true that "A personal representative may waive or renounce his right to compensation, and such waiver or renunciation need not be express but may be implied from his acts and conduct" (*Taylor's Estate,* 239 Pa. 153, 167,) it is to be noted, as we pointed out in the *Taylor* case, that, "What amounts to a waiver of commissions must be determined, like all other questions of waiver, by the acts or omissions of the party entitled otherwise to claim them." We are satisfied that the lower court properly held that under the facts of this case there was no waiver. Furthermore, it cannot be assumed that the accountant could waive his right to compensation out of the corpus because he did not claim it in the first and partial account, since he was not entitled to receive such compensation prior to the filing of his final account. As we stated in *Penn-Gaskell's Estate (No. 1),* 208 Pa. 342, 344: "The duty of a trustee is to preserve the estate and that duty is not fully performed until the time for distribution is reached or the trustee's relation to the estate ends. The rule therefore is that commissions on the principal of a trust estate will not be allowed except when the fund is in course of distribution."

This rule can be departed from only where the circumstance of the estate "are of the most unusual and extraordinary character . . .": *Thouron's Estate*, 182 Pa. 126, 130. There were no such unusual and extraordinary circumstances here. (*Snyder Estate*, 346 Pa. 615.)

Although Richard Coulter's tasks as trustee were many and varied, he did no more than he was authorized and directed to do under the terms of his mother's will. When he assumed the duties of trustee he knew that the real estate of the decedent was to be divided and improved by streets, alleys, sewers, etc., and sold as lots. In fact, part of decedent's real estate had been plotted prior to her death and some lots had been sold in an unrecorded plan known as the Coulter Farm, in Hempfield Township and the City of Greensburg; 21 of such lots remained unsold at the time of her death. Thus, there were no such extraordinary or unusual services that would call for a modification of the rule that a commission on the corpus of a trust is not allowed until the trust has terminated or the particular trustee's relation to it has ended. As recently as June 27, 1951, in the case of *Williamson Estate*, 368 Pa. 343, 350, this Court said: "We have repeatedly decided that except in extraordinary or unusual circumstances a trustee is to be compensated *only at the termination of the trust or at the ending of the trustee's connection therewith. . No interim* commission on principal is originally allowable under the law so declared. . ."

Exceptions to the credits taken in the First and Partial Account for losses in the operation of the Coulter Building and to credits taken in the First and Partial Account in operation of the Hawksworth Farm were properly dismissed by the court below. The trustee furnished each beneficiary with annual de-

tailed statements of items of receipts and disbursements and on February 18, 1949 filed his First and Partial Account, which was duly advertised, confirmed nisi, audited by the Court, and confirmed absolutely and a decree of distribution made. The Petition for Distribution filed at the audit shows that actual notice of filing the account and the call thereof for audit was served on all parties in interest. No exceptions were filed. In order to entitle them to a review of that First and Partial Account which has been settled and confirmed by the court, the exceptants (appellants) would, as stated by this court in *Nixon's Estate*, 239 Pa. 270, 273, and *Rees's Estate*, 246 Pa. 188, 194, have to show: (1) an error of law apparent on the face of the record; or (2) new matter which has arisen since the decree; or (3) the subsequent discovery of new evidence which could not have been obtained previously by the use of due diligence. It is not averred that any of these three situations is present here. Laches presents another barrier to realization of the contentions advanced by the appellants.

The exceptant William A. Coulter contends further that the trustee should be surcharged for the loss ($6,100.17) sustained in operating the Hawksworth Farm or should be held to have forfeited his right to commissions as a result thereof. The court below dismissed this exception and held that there was no ground for any such surcharge or forfeiture of trustee's commission. This conclusion was a correct one since, as the court pointed out, there was no evidence of waste, extravagance or negligence in the management of the Hawksworth Farm. The course of conduct and management never deviated during the long period the exceptants were supplied by the trustee with an annual statement of all receipts and disbursements.

What was said in *Wilbur's Estate,* 334 Pa. 45, 55, could well apply here: "Instead of demanding a formal account, he received, with apparent satisfaction, the annual statements submitted to all the sons; the record would indicate that there was no protest; after the lapse of time, it must be assumed that he was satisfied with the administration. The exceptant, since her husband's death, expressed no dissatisfaction with the administration of the trusts prior to requesting the account. . . . Not only is the long delay in failing to challenge the trust administration a complete bar, but we think the conduct of Ray Wilbur and of the exceptant is evidence of acquiescence."

As to the alleged loss to the estate by reason of the fact that produce from the farm was sold in limited quantities to certain of the beneficiaries "at less than market price", we cannot conclude that such would be ground for surcharging of the trustee or causing a forfeiture of his commissions. Most farmers sell produce at less than the market price when they are making the sales at their own farm.

The exceptant, William A. Coulter, further asked that the trustee be surcharged for and be held to have forfeited his commissions for losses sustained by sales of real property to John H. Coulter, et ux, and to Paul S. Bair, et al. The trustee sold to John H. Coulter a tract inventoried at $1,355.03 for $2,000. John H. Coulter about eight or nine months later sold a part of this tract to the Atlantic Refining Company for $8,000. The exceptant complains that "there can be no doubt that the trustee, himself, by ordinary diligence, could have sold the property as a gas station site and obtained for the estate at least as much profit as the nephew made." The exceptant charges the trustee with self-dealing with respect to this sale to the nephew.

The Court below properly pointed out: "There is absolutely no evidence nor allegation that the trustee had any financial interest in this transaction, other than he sold his own one-fifth equitable interest in the tract along with that of other beneficiaries. There is no evidence that the purchaser was in a position to favor the trustee in any way. The exceptant relies chiefly on the fact that the purchaser is a nephew of the trustee. That certainly is not enough to sustain a charge of self-dealing, particularly in view of the fact that the trustee sold to the same nephew another tract of land, inventoried at $10,000.00 for the price of $30,000.00. This transaction is not questioned." Nor is there any merit to the statement that the trustee should have obtained for the estate the profit the nephew made on the resale. John H. Coulter testified that when he first purchased the property from the trustee he had no contemplated use for it, but later concluded to erect a gas station on it, and lease it to one of the large producing Companies. When Gulf refused to even look at his property, he contacted Atlantic Refining Company which eight months after Coulter's purchase finally acquired the property.

Another sale objected to by exceptant William Coulter for which he seeks to surcharge the trustee and deny him the commissions claimed is the one to Paul S. Bair, Joseph K. Robinson and Frank E. Heasley (officers and employes of the First National Bank in Greensburg, of which bank the trustee was Board Chairman). These persons purchased the property for $8,000 and sold it for $14,700. It is argued by the appellants that if the trustee had "bestirred himself to advertise the property for sale and to search for a purchaser, the trustee could have sold as readily as did his grantees, and thereby brought into the estate $14,700 instead of $8,000." But it does not follow that

because the grantees were fortunate enough to have good selling weather that the trustee would also have been assured of clear skies at the time a sale was possible. In fact, the record shows that the trustee achieved a commercial advantage in disposing of the property to Bair et al for, at the time of the transaction, the latter had no prospective purchasers in view. Their later efforts to re-sell were not without disappointment. "We were getting pretty sick of the deal for a while," testified Mr. Bair.

We are satisfied that there was no self-dealing or supine negligence, as alleged by the appellants, which would justify waiver of trustee's commission or forfeiture thereof. In view of the work done and the size of the estate, the amount claimed by the trustee was not unreasonable.

Nor can it be assumed that because Rebecca Coulter Barclay or her estate did not make any claim for services rendered as trustee, that this would in any way be determinative of Richard Coulter's right to his fee.

We also conclude that the court below did not err in allowing the attorney for the accountant (trustee) a fee out of the trust assets in the sum of $2,000 for his services for and in behalf of Richard Coulter. As this Court stated in *Wormley Estate,* 359 Pa. 295, 300: "It is well established that whenever there is an unsuccessful attempt by a beneficiary to surcharge a fiduciary the latter is entitled to an allowance out of the estate to pay for counsel fees and necessary expenditures in defending himself against the attack."

We accordingly affirm the decrees of the Orphans' Court of Westmoreland County, with costs on appellants.